**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BEVERLY PEARSON,

|                         |                                                   |
|-------------------------|---------------------------------------------------|
|                         | CIVIL ACTION NO. 2:15-cv-14031-MOB-PTM            |
| *Plaintiff*,            | DISTRICT JUDGE MARIANNE O. BATTANI               |
| *v.*                    | MAGISTRATE JUDGE PATRICIA T. MORRIS              |

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Pearson is not disabled. Accordingly, **IT IS RECOMMENDED** that Pearson's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* and

1

Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 16).

In a previous application filed on November 23, 2009, Plaintiff Beverly Pearson alleged a disability onset date of January 20, 2008. (Tr. 117). This claim proceeded to a hearing before ALJ JoErin O'Leary on January 24, 2011. (*Id.*). On April 5, 2011, ALJ O'Leary denied Pearson's claim. (Tr. 114-30).

Pearson filed the instant application for DIB and SSI on July 27, 2012, with an alleged onset date of January 20, 2008.  (Tr. 164-65, 223-35). The Commissioner denied both claims. (Tr. 136-65). Pearson then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on July 25, 2013, before ALJ Kathleen Eiler. (*Id.* at 54-78). At the hearing, Pearson—represented by her attorney, John Wildeboer—testified, alongside Vocational Expert ("VE") Sue Lyon. (*Id.*). The ALJ's written decision, issued September 22, 2015, found Pearson not disabled. (*Id.* at 31-49). On September 22, 2015, the Appeals Council denied review, (*Id.* at 1-6), and Pearson filed for judicial review of that final decision on November 17, 2015. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014)

2

(internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the

Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Pearson not disabled under the Act. (Tr. 31-53). At Step One, the ALJ found that Pearson had not engaged in substantial gainful activity following the alleged onset date of April 6, 2011. (Tr. 37). At Step Two, the ALJ concluded that the following impairments qualified as severe: "herniated nucleus pulposus status post fusion and affective disorder." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 37-40). Following this, the ALJ found that Pearson had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [T]he individual could frequently lift ten pounds and occasionally lift 25 pounds with the need to sit/stand at will in order to alleviate pain. The individual could not climb ladders, ropes, or scaffolds. The individual can crouch, kneel, or crawl, but could only occasionally balance or stoop. The individual could not operate foot controls or work at unprotected heights. The individual would have concentration problems related to pain complaints, but could understand, remember, and carry out routine and repetitive tasks. The individual[] would not be able to perform work involving abstract thought, planning, or complex instructions.

(Tr. 40). At Step Four, the ALJ found Pearson "unable to perform any past relevant work." (Tr. 47). Proceeding to Step Five, the ALJ determined that there exist jobs in significant numbers in the national economy that the claimant can perform, and thus found Pearson not disabled. (Tr. 47).

### E. Administrative Record

#### 1. Medical Evidence

Pearson's medical records illustrate an increase in the severity of her back problems beginning in 2008. In February 2008, an MRI revealed "[p]redominantly central focul extruded disc herniation at the L5-S1 level." (Tr. 422). Later that year, in November 2008, Pearson had an operation performed on her back—"Decompressive lumbar laminectomy L5 with left L5-S1 with EBI-Polaris rods and iliac crest graft plus local bone graft and ProOsteon 500R bone graft substitute with marrow aspirate." (Tr. 425). Over the following years, and particularly since 2011, Pearson's visits to N.P. Booms and Dr. Lanser read similarly. In January 2011, she sought treatment for "depression" and "med refills" as well as "[d]isability paperwork." (Tr. 342, 345). N.P. Booms penned a letter that month reporting results from Dr. Bleiberg's functional

6

capacity exam a number of years before, which revealed "limited active range of motion globally for cervical and lumbar spine" with "measurable weakness in the left lower extremity by as much as 38% except for right foot eversion, which was weaker by 41% than the left." (Tr. 346). In addition, N.P. Booms suggested that Pearson only had the "ability to sit or reach on an occasional basis and no ability to squat, bend or stand." (*Id.*). The letter described "weight restrictions of 25 pounds waist level lifting; 20 pounds carrying and knee level lifting[;] 15 pounds push/pull or shoulder lifting[;] [and] 10 overhead or floor level lifting." (*Id.*).

Later that year, in August 2011, Pearson complained again of back pain. (Tr. 351). Although a physical exam in January 2012 revealed no abnormalities, Pearson underwent continued conservative treatment for her pain. (Tr. 356). That month, N.P. Booms filled out a medical source statement, counter-signed by Dr. Lanser, indicating that Pearson could occasionally lift, carry, or pull upward 10 pounds in an 8 hour workday, frequently do so for weight less than 10 pounds, stand or walk less than 2 hours, and sit continuously for less than 6 hours, with moderate difficulties operating hand or foot controls. (Tr. 394). The statement indicates that her limitations spanned the preceding 5 years. Dr. Lanser later wrote, in June 2012, that Pearson's back pain was "stable" but occurred "persistently." (Tr. 357). This pain would "radiate[] to [her] right leg." (Tr. 371). She also noted normal gait and lack of fatigue." (Tr. 372). Other chronic issues included depression and hypertension. (Tr. 359). Dr. Lanser continued to conservatively treat Pearson's conditions. (*Id.*). Dr. Findley's November 2012 analysis noted that she

only "attempts to do minor household chores on her 'good' days [and] relies a great deal on her daughter and her 'ex.'" (Tr. 390).

Around November 2012, Pearson's depression appeared more prominently in the medical records as well. A September 2012 note from Alicia Mannes, M.A., said "I am concerned about her depression," (Tr. 404), while another suggested "rehab didn't help" her "chronic pain," which in turn contributed to her depressive symptoms, (Tr. 384). Treatment notes from Dr. Lanser's September 2012 follow-up appointment with Pearson suggested that she "reports functioning as somewhat difficult" and recounted that "[s]he had one suicide attempt about 4 months ago. She was going to shoot herself with a gun. Mood swings are bad. She [Alicia Mannes, M.A.] did the depression screen on her. She scored severe." (Tr. 431). It says her "Mood Disorder is associated with chronic pain." (*Id.*). The notes also showed positive testing for fatigue, pain, anxiety, decreased sleep, difficulty initiating sleep, difficulty maintaining sleep, excessive worry, and suicidal ideation. (Tr. 432). Dr. Findley's November 2012 notes articulated her frustration that she was "no longer able to pursue her interests of hunting, snowmobiling, skiing, etc., due to her back pain," and that "she does not keep a checkbook because of her poor concentration and forgetfulness." (Tr. 390). He also described her prognosis as "fair" because "she appears capable of understanding moderately complex instructions and carrying out routine, repetitive tasks without supervision." (Tr. 391).

In an undated medical source statement, Dr. Lanser described Pearson's "chronic low back pain," and "deg[enerative] disc[ disease]" and the limitations it placed upon her abilities to work. (Tr. 416). Unlike the first medical source statement, this statement

8

suggested that Pearson could lift, carry, or pull upward less than 10 pounds, stand or walk less than 2 hours, and sit continuously for less than 6 hours. (*Id.*). No analysis attended these findings, although Dr. Lanser noted that Pearson "reports daily problems," had such limitations for five years, and "has [a] medical marijuana card – Not prescribed by me." (*Id.*).

In May 2013, N.P. Booms relayed that Pearson's pain was "ok with meds." (Tr. 443). Treatment notes from Dr. Lanser's June 2013 appointment with Pearson noted the following observations: "She states that she can't sit for 6 hours or more during the day because the pain is unbearable. . . . She states even if someone touches her back it sends severe pain." (Tr. 449). Dr. Lanser also noted that Pearson's "last scan was in 2010," and that her "last EMG was before [her 2008] surgery." (*Id.*). "She has not reported any changes [after] the last exams were done in 2009." (*Id.*). At the time, Pearson took Cymbalta, Gabapentin, Tramadol, Seroquel, Flexeril, Mobic, Norco, and Prilosec to help with her sleep, depression, and pain. (Tr. 318-19). Dr. Lanser prescribed each of these medications. (*Id.*).

### 2. Application Reports and Administrative Hearing

#### a. Function Report

Pearson completed a function report on August 30, 2012. She wrote of "lots of bad days with pain," requiring her to seek "help with multiple personal tasks." (Tr. 266). Though she could do laundry, she could not carry the basket upstairs, so her nine-year old or roommate did it. (*Id.*). She also needed help dressing. (*Id.*). Her pain caused "insomnia + sleeping problems," "mood swings" and "concentration problems." (*Id.*). The

9

medications she took at that time included medical marijuana, Flexial, and Cymbalta. (Tr. 274, 286). But these often "make me sleep." (Tr. 268). "[O]n better days I sweep the floors," "[do] dishes" and "make simple meals." (*Id.*). Her daughter "takes care of herself and helps me on bad days." (*Id.*).

Before her injury, Pearson said "I was very active, worked everyday, could do anything I wanted," but that "I sleep an hour or two at a time, then I have to get up sometimes . . . because of the pain." (*Id.*). When dressing, "sometimes I can't bend to get my pants on and shoes," and her pain "makes the decision on whether I take a shower." (*Id.*). "Sometimes" she needed help using the toilet as well. (*Id.*). Typically, she prepared simple meals such as "sandwiches, eggs, cereal, frozen dinners, [and] crock pot dinners," though "on really good days I can make complete meals." (Tr. 269). Due to problems standing, she cooked "once dail[y]." (*Id.*). She avoided yard work because "I sometimes lose my balance and fall due to the uneven ground." (Tr. 270).

Pearson traveled by walking or driving. (*Id.*). Although "pain prevents me from going in to town," she did shop for groceries and take trips to the pharmacy for medication. (*Id.*). She limited her trips to an hour and a half to avoid unnecessary discomfort. (*Id.*). She could pay bills, count change, and handle a savings account, but did not use a checkbook due to forgetfulness in writing entries. (*Id.*).

Pearson's hobbies included "reading, tv, [and] computer," all of which she did "dail[y] on and off." (Tr. 271). She also enjoyed playing board games and crafting with her daughter. (*Id.*). Since her alleged onset date, "[t]here are tons of physical activities I've had to give up." (*Id.*). She went nowhere on a regular basis and needed to be

10

reminded of appointments with doctors. (*Id.*). Social interactions presented difficulty because "I'm hard headed" and "no one agrees with my change of attitude" because "I get angry" and "annoyed quick[ly]." (Tr. 272).

When asked to check boxes indicating difficult activities, Pearson marked: lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, following instructions, and getting along with others. (*Id.*). Illustrating these difficulties, she wrote that "a gallon of milk sends pain through my back," and "sometimes things need to be explained more th[a]n once." (*Id.*). She handled stress by "break[ing] down crying" or "get[ting] annoyed, angry." (Tr. 273).

Pearson's friend, Roger Lee VanBuskirk, also filled out a third party function report on September 3, 2012. (Tr. 279-286). It mirrors Pearson's report in every relevant way.

### b.  Pearson's Testimony at the Administrative Hearing

At her hearing before ALJ Kathleen Eiler, Pearson indicated that she lived in a house with her boyfriend and ten-year-old daughter. (Tr. 57-58). She suffered a work-related back injury in January 2008. (Tr. 58). The injury required a "laminectomy" surgery, and she did not meaningfully return to work thereafter because "[t]he pain would increase so bad after four hours" and she "was falling at home. I couldn't physically do anything to help myself." (Tr. 58-59).  She then had a worker's compensation claim that settled for $100,000, covering lost wages and "two medical bills." (Tr. 59).

Her "stabbing, gripping" back pain continued each day "unless I stay in bed for 24 hours." (Tr. 60). If she stood too long, "it turns into a burning. You can't touch. Goes

11

down my right leg." (*Id.*).  She described it as "eight" on a "10 point scale." (*Id.*). To handle the pain, she took "Flexeril, Neurontin, Tramadol, Cymbalta, Seroquel, . . . a medical marijuana card," and "Mobic" since 2009. (Tr. 61). She took medication every day to make the pain "bearable." (*Id.*). She also "la[id] down" and "change[d] positions frequently" approximately "three to four times" each day in "two hour increments." (Tr. 62). She could only sit comfortably for twenty to thirty minutes before "my back will start shooting the pain down my leg." (*Id.*). To ameliorate this feeling, she "either la[id] down or st[ood] up and walk[ed] around" on "level, even ground" to ensure that she did not "trip" and "fall backwards." (Tr. 62-63). This phenomenon also made it difficult for her to stand, and "I couldn't stand up out of the car myself." (Tr. 63). On the way to the hearing itself, she said she did not drive herself and had to stop three times "[t]o change positions " and "relieve the pain a little bit." (Tr. 63-64).

She proclaimed difficulty accomplishing tasks around the house for these reasons. "[M]aybe twice a month I might be able to do a sink full of dishes. I usually have to sit down in between. You know, swapping them out. Like I'll get one done and then put more in and have to sit." (Tr. 64). She also "might wash windows once every three" to "six months," but could not do laundry because "[i]t's in the basement now and I can't walk up and down the stairs to do that." (Tr. 65).  Anything that involved bending or lifting was difficult because "[i]t increases the pain to unbearable," aside from perhaps a "[g]allon of milk once in a while." (Tr. 66). Although Seroquel helped her manage sleep apnea, she still awoke every four hours or so in pain. (Tr. 69).

12

Emotional difficulties proved traumatizing as well. As she says: "Got depression severely" to the extent that "I'll lock myself in my room because, just other people being around me, the pain. It just all gets to you." (Tr. 67). She did this about five times a month. (*Id.*). Her mood on an average day was "usually angry." (*Id.*). This manifested in her interactions with others as well, "[l]ike to arguing over nothing or being snappy at my daughter." (Tr. 68). She applied the same behavior to her friends and relatives. (*Id.*).

Income came in the form of worker's compensation payouts, contributions from her boyfriend, and child support for her daughter. (Tr. 70). She would have to wait about four hours before driving if she had ingested her medical marijuana, which also made timing her trips difficult. (Tr. 72). Although she could travel for short distances, such as a corner store "five miles away," she did so supervised by her daughter. (Tr. 71). She visited Dr. Lancer or N.P. Booms "[e]very three months," and the last time she received counseling for depression was "[f]our months ago." (*Id.*).

### c.  The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Pearson's ability to perform work. (Tr. 73). The VE first sought clarification regarding Pearson's past work. Pearson indicated that the "heaviest" weight she lifted as a gas station cashier was "[f]ifty pounds."(*Id.*). At the nursing home jobs, she lifted "[n]o more than 125 [pounds]." (Tr, 74). And at her fast food job, the heaviest amount lifted was "[f]ifty pounds." (*Id.*).

Commencing Step Four of her analysis, the ALJ asked the VE to assume a hypothetical individual of "the same age, education, and work experience as the Claimant" who "can perform work at the light exertional level, except that she can

frequently lift and/or carry 10 pounds and occasionally lift and/or carry 25 pounds with the need to sit/stand at will in order to alleviate pain." (Tr. 74-75). Further, she "cannot climb ladders, ropes, or scaffolds. She can never crouch, kneel, or crawl. She can occasionally balance or stoop. She can never operate foot controls or work at unprotected heights. She has concentration problems related to pain, but she can understand, remember, and carry out routine, repetitive tasks, but will not be able to perform work involving abstract thought or planning, or complex instructions. Could this person perform any of the Claimant's past work?" (Tr. 75). The VE answered, "No." (*Id.*).

Moving to Step Five of the analysis, the ALJ then asked whether this person could perform other jobs. (*Id.*). The VE replied that there would be "a range of unskilled, light work that would fall within those parameters," including "cashier or toll taker" with 8,500 regional jobs in Michigan, and 250,000 jobs nationally. (*Id.*).

Altering the hypothetical, the ALJ reduced "the exertion level to sedentary but kept everything else the same," and the VE indicated that "assembly positions done at a bench or a table" would be available (1,700 regional, 40,000 national), "[p]ackaging positions at a bench or table" (1,000 regional, 30,000 national), and "inspection positions done at a bench or table" (600 regional, 13,000 national). (Tr. 76).

In the third hypothetical, the ALJ asked "if I added to either of the first two that, in addition, this person is expected to miss work at least two times per month," the VE said that such a condition "would change both of my responses" and "would be work-preclusive and not tolerated by an employer." (*Id.*). In response to a question from

Pearson's counsel, the VE also indicated that an individual able to stand and walk for only six hours and sit for two hours "would not equate to full time work." (Tr. 77).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at

15

whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §

16

404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ

17

then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)     [D]aily activities;
    (ii)    The location, duration, frequency, and intensity of . . . pain;
    (iii)   Precipitating and aggravating factors;
    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)    Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

18

Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ

can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents reviewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond. See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

20

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win

21

benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence

must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four

23

years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). However, courts may review a decision not to reopen a case "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer,* 40 F. App'x at 690 ("But 'we will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). As the Sixth Circuit lamented,

> If an ALJ intends to reopen prior decisions, he or she should say so, say why, and cite the appropriate regulation that permits reopening. If an ALJ intends instead to adjudicate only the subsequent period in light of

> changed circumstances, he or she should make this approach clear and
> cite the appropriate cases and acquiescence rulings. Regardless of which
> path the ALJs take, they must clearly state their approach.

*Id.*; *see also Haddix v. Astrue*, No. 10-30, 2010 WL 4683766, at *1-4 (E.D. Ky. Nov. 12, 2010) (remanding where ALJ's decision was unclear).

Constructive reopenings are found where the ALJ reviewed the entire record including the portions from the already adjudicated period, and decided "the merits of the claim." *Tobak*, 195 F.3d at 186. Thus, the Sixth Circuit found a reopening where the ALJ considered the entire period "in light of the new evidence . . . ." *Wilson v. Califano*, 580 F.2d 208, 212 (6th Cir. 1978). An additional factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these

periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G. Analysis

Pearson includes the following arguments in her appeal: (1) That the ALJ's analysis did not comply with the requirements imposed by 20 C.F. R. 404.1527(c) because it withheld controlling weight from Dr. Lanser's opinions and failed to note or assign weight to a separate opinion from Dr. Lanser. (Doc. 14 at 4). (2) That the ALJ withheld from N.P. Booms's opinion "significant weight." (*Id.*). (3) That the ALJ improperly found the prior RFC binding on the unadjudicated period. (*Id.*) And (4) that the ALJ erred in omitting discussion of Pearson's June 2010 Worker's Compensation settlement. (*Id.*). I address each argument in turn.

### 1. The ALJ Did Not Err in Declining To Grant Controlling Weight to Dr. Lanser's Opinions

Pearson contends that the ALJ's decision "failed to provide any specific reasons for the weight given to Dr. Lanser's opinions and failed to assess Dr. Lanser's opinions using the factors contained in 20 C.F.R. 404.1527(c)." (Doc. 14 at 16). With respect to Dr. Lanser's June 4, 2012 Medical Examination Report, Pearson suggests that the ALJ "mischaracterize[d] the record" in finding Dr. Lanser's opinion inconsistent with her treatment notes, and "failed to cite any medical evidence" that would discredit Dr. Lanser's conclusions. (*Id.* at 8). Pearson also avers that the ALJ's "ambiguous" language cloaked the reasoning behind her finding that Dr. Lanser's June 10, 2013 Medical Source

Statement relied heavily on Pearson's subjective reports of pain. (*Id.* at 10). Because "specific good reasons" are required in each instance, Pearson suggests the ALJ erred in her analysis. (*Id.*).

Controlling weight attaches only when an opinion (1) comes from a "treating source," (2) qualifies as a "medical opinion" about "the nature and severity of an individual's impairment(s)," (3) is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (4) is "not inconsistent with the other substantial evidence in the individual's case record." SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996) (internal quotation marks omitted). If an ALJ does not grant the treating source controlling weight, it is entitled to such deference as the ALJ determines appropriate after evaluating the six-factor balancing test outlined in 20 C.F.R. § 404.1527. *Id.* at *4. In any event, the ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" when rendering a "denial," and "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* at *5.

The ALJ's decision to grant Dr. Lanser's opinions little weight is supported by substantial evidence. Noting some cognitive dissonance among Dr. Lanser's June 2012 clinical observations of "normal gait" and "no tenderness or mobility deficits . . . and only 'mildly' reduced range of motion" on the one hand, (Tr. 43)—and her same-day conclusions (in a separate form) that Pearson "would require help with activities of daily living 'on bad days,'" could "occasionally lift less than 10 pounds," and could only stand

27

or walk for "less than two hours during an eight-hour workday" on the other hand, (*Id.*)—
does not, as Pearson suspects, "mischaracterize[]" the record so much as interpret it.
(Doc. 14 at 8). Substantial evidence bolsters the ALJ's finding that Dr. Lanser's ultimate
opinion draws extreme conclusions from a range of fairly mild restrictions. *See Spicer v.
Comm'r of Soc. Sec.*, No. 15-2395, 2016 WL 3194700, at *2 (6th Cir. 2016) ("The record
did not substantiate many of the restrictions Dr. Dallas noted . . . and [the ALJ]
discounted it accordingly."). The medical evidence cited by the ALJ in making this
finding comes directly from Dr. Lanser's June 2012 treatment notes. (Tr. 43). Identifying
internal inconsistencies such as these meets the ALJ's duty to provide "specific good
reasons" for assigning little weight to the June 2012 Medical Examination Note.

Similarly, the ALJ's rationale for granting little weight to Dr. Lanser's June 2013
medical source statement is supported by substantial evidence. As the ALJ notes, Dr.
Lanser's opinion mirrors her June 2013 treatment notes, which in turn self-evidently
relays Pearson's subjective complaints. For instance:

> "*She states* that she can't sit for 6 hours or more during the day because
> the pain is unbearable. . . . *She states* for example she was at a birthday
> party and couldn't even stay for the whole party and had to go home. *She
> states* even if someone touches her back it sends severe pain. . . . *She
> reports* ongoing pain and problems on a daily basis making it impossible
> for her to sit over 6 hours a day or to do any lifting, standing, walking etc
> [sic] due to her significant pain. . . . She has numbness *she reports* in the
> right leg."

(Tr. 449) (emphasis added). In addition, Dr. Lanser's "Review of Systems" lists "[g]ait
disturbance" even though the "Physical Exam" section says "[g]ait is normal." It also
notes that Pearson "had a negative SLR [straight leg raise]. . . . [and] some mild

28

tenderness in the lower back area." Considering the discrepancies between what Pearson evidently reported to Dr. Lanser and what Dr. Lanser detected in the physical exam, the ALJ was permitted to infer that Dr. Lanser "relied quite heavily" on Pearson's subjective reports. (Tr. 44). "A physician's statement that merely regurgitates a claimant's self-described symptoms 'is not a medical opinion at all.'" *Ryan v. Comm'r of Soc. Sec.*, No. 1:13-cv-1380, 2015 WL 1478263, at *4 (W.D. Mich. Mar. 31, 2015). Although the ALJ does make vague reference to this opinion's inconsistency with "the above noted medical evidence of record," (Tr. 44)—which does not, on its own, constitute a specific good reason—she discusses Dr. Lanser's reliance on Pearson's subjective statements, which goes to the supportability of Dr. Lanser's medical source statement under § 404.1527. This constitutes proper reasoning.

As such, the ALJ's decision to grant Dr. Lanser's June 2012 and June 2013 opinions little weight is supported by substantial evidence. Compiling favorable facts and arguments, Pearson makes a passable case for assigning Dr. Lanser's opinions greater weight. (Tr. 12-15). But "[a]s long as substantial evidence supports the Commissioner's decision, we must defer to it, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)) (internal quotation marks omitted).

### 2. The ALJ Did Not Err in Declining To Grant Significant Weight to N.P. Booms

Pearson avers that the ALJ's decision runs counter to SSR 06-03p in using the fact that N.P. Booms is not an acceptable medical source as grounds for assigning it little weight, and further "fail[ing] to explain the weight given to the opinion." (Doc. 14 at 10). In addition, Pearson takes issue with the ALJ's consideration of Ms. Booms's January 31, 2011 letter because it predates Pearson's alleged onset date, and "simply . . . recit[es]" findings from Dr. Bleiberg's earlier evaluation. (*Id.* at 17-18). According to Pearson, the ALJ weaponized the letter's defects against N.P. Booms's credibility by construing the letter as an *adoption* of Dr. Bleiberg's earlier findings—as opposed to a "mere[] . . . recitation"—and then using discrepancies between the letter and the next year's assessment to undermine the latter. (*Id.*). Pearson continues that "no substantial evidence" supported a finding that N.P. Booms's January 2012 assessment "was in some way based on Dr. Bleiberg's assessment of 2009." (Doc. 14 at 19). As a result of these alleged errors, Pearson posits that N.P. Booms's opinion was wrongfully denied significant weight.

In determining whether Pearson's condition had deteriorated since the prior disability determination of April 2011, the ALJ was permitted to evaluate both the January 2011 letter—as evidencing Pearson's past condition—and the January 2012 evaluation—as evidencing an alleged change in Pearson's circumstances. Indeed, the ALJ independently assigned weight to N.P. Booms's January 2011 letter and her January 2012 medical source statement, but partially grounded the weight given to the latter on inconsistency with the former. In her analysis, the ALJ acknowledged the derivative nature of N.P. Booms's findings—namely, that N.P. Booms "is basing her opinion off a

prior evaluation that occurred during the period that is not under review." (Tr. 43). But Pearson contends that N.P. Booms merely "recit[ed] . . . Dr. Bleiberg's finding in 2009," thus giving the letter "limited relevance" to Pearson's claim.

Pearson's construction seems apt. The letter's first sentence mentions the functional exam Dr. Bleiberg performed in August 2009. Significantly, N.P. Booms carefully avoids adopting Dr. Bleiberg's findings and uses no prescriptive language. For instance:

> "Patient *was tested* as having the ability to sit or reach on an occasional basis and no ability to squat, bend or stand. She has weight restrictions of 25 lbs waist level lifting; 20 lbs carrying and knee level lifting, 15 lbs push/pull or shoulder lifting, 10 overhead or floor level lifting. *It was recommended* that retesting be done at a later date to reevaluate deficits. *At that time he recommended* that she should remain off work."

(Tr. 346) (emphasis added). The letter thus neither adopts Dr. Bleiberg's findings nor implies that they subsist. The ALJ erred in finding that inconsistency with the January 2011 letter detracted meaningfully from the reliability of N.P. Booms's January 2012 evaluation.

Nevertheless, the ALJ did not err in granting N.P. Booms's January 2012 evaluation little weight because an ALJ need not give "good reasons" for rejecting opinions from non-acceptable medical sources. "[T]he SSA requires ALJs to give reasons for only *treating* sources." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). Although the ALJ "generally should explain the weight given to opinions from . . . 'other sources,'" there

31

remains "a distinction between what an adjudicator must consider and what the adjudicator must explain." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006).

Here, the ALJ gave three particular reasons for devaluing N.P. Booms's January 2012 letter: (1) it is inconsistent with "her January 2011 opinion"; (2) she [N.P. Booms] is not an acceptable medical source"; and (3) "it [the January 2012 evaluation] is not consistent with the above noted medical evidence of record." (Tr. 43). Subtracting from the ALJ's reasoning the first rationale leaves the latter two. As to the second reason: The fact that an opinion is not from an acceptable medical source may justify giving that opinion less weight. *See* SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006) ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'"). As to the third reason: The ALJ mentioned instances in the medical record that cast doubt on N.P. Booms's credibility. *E.g.*, (Tr. 42) ("A formal musculoskeletal examination did not appear to have taken place. Nonetheless, Ms. Booms assessed the claimant with back pain."). That the specific language Pearson highlights is arguably ambiguous does not detract from the ALJ's clarity throughout the opinion as a whole, especially concerning the veracity of N.P. Booms's reflections. *Cf. Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006) ("The ALJ's references to the opinions of [the treating physicians] are brief, and provide no explicit indication of the weight [given to] either doctor's opinion regarding Nelson's limitations, as the ALJ was required to do. However, the ALJ's discussion of the other record

32

evidence . . . makes clear that the opinions of [the treating physicians] as to Nelson's limitations do not meet one of the two criteria for controlling weight.").

### 3. The ALJ Did Not Err in Failing To Address the August 2011 Treatment Note

Singling out an August 12, 2011 treatment note, Pearson suggests that the ALJ failed to properly address "Dr. Lanser's" diagnoses of "chronic pain and depression" therein. (Doc. 14 at 11). Pearson correctly notes that *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 748 (6th Cir. 2007) describes how a "failure to 'give good reasons' for rejecting the opinion of the claimant's *treating physician*" may "require[] a remand because it violate[s] the substantive protection" that 20 C.F.R. § 404.1527(d)(2) affords claimants. But Pearson also misleads the Court by pretending that Dr. Lanser drafted the treatment note—the portion of her record cited as support for this assertion says: "Enclosed for filing in support of Ms. Pearson's appeal please find a Medical Source Statement (Physical) completed by claimant's treating nurse practitioner, *Ms. Lori Booms*." (Tr. 393). N.P. Booms's name also appears in the bottom left corner of the form itself. (Tr. 394). Because I find the ALJ's decision to grant little weight to N.P. Booms's opinion bolstered by substantial evidence, this omission is, at most, harmless error.

### 4. The ALJ Properly Applied *Res Judicata* to ALJ O'Leary's April 2011 Opinion

Pearson claims that the ALJ "failed to cite any evidence of record to support the finding that [Pearson's] condition had not changed since the 2011 ALJ Decision." (Doc. 14. at 20). She contends that new and material evidence—"Exhibits 1F through 7F and

Exhibit 10F"—all "post-date the ALJ Decision of July 23, 2008 and were not considered by the ALJ in issuing the 2008 Decision." (Doc. 14 at 21).

When presented with evidence from an unadjudicated period, the ALJ must decide whether it constitutes "new and material evidence of deterioration" that "show[s] . . . circumstances have changed since the first hearing before the ALJ." *Slick v. Comm'r of Soc. Sec. Admin.*, No. 07-13521 2009 WL 136890, at *5 (6th Cir. Jan. 16, 2009).

Pearson's argument requires some date disentangling: Exhibit 1F is dated January 3, 2011; Exhibit 2F is dated June 4, 2012 to August 20, 2012; Exhibit 3F is dated September 5, 2012 to October 10, 2012; Exhibit 4F is dated November 7, 2012; Exhibit 5F is dated January 3, 2013; Exhibit 6F is dated September 5, 2012 to February 14, 2013; Exhibit 7F is dated May 15, 2013. As a preliminary matter, it should be noted that the prior ALJ decision became final and binding on April 5, 2011, not July 23, 2008. For this reason, only Exhibits 2F through 7F and 10F actually post-date the prior decision.

Because Exhibit 1F relates to an already adjudicated period, it may only be considered as evidencing disability at that time upon a reopening of the prior decision. In effect, then, Pearson asks the Court for a Sentence Six remand of the prior decision on the grounds of Exhibit 1F. The prior adjudication occurred more than a year before the present adjudication, but less than two years before, and so reopening is permitted only if Pearson can demonstrate that the evidence contained in Exhibit 1F furnishes "good cause"—i.e. that it is "[n]ew and material evidence," 20 C.F.R. § 404.989(a)(1), and that "there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Pearson has not alleged why she did not incorporate

this evidence into the prior administrative record, and thus cannot establish that it is "new."

Exhibits 2F through 7F and 10F all post-date the prior ALJ decision and predate the second ALJ decision of September 20, 2013. The ALJ evidently rendered an in-depth evaluation of this evidence in her opinion. (Tr. 41-43) (evaluating Exhibit 1F); (Tr. 42) (evaluating Exhibit 10F); (Tr. 43) (evaluating Exhibits 2F and 5F); (Tr. 44) (evaluating Exhibit 7F); (Tr. 45) (evaluating Exhibits 3F, 4F, and 6F). Ultimately, and largely in light of this evidence, the ALJ concluded that Pearson's condition had not sufficiently deteriorated because of her "routine and conservative" treatment, the effectiveness of her medication, and her lack of credibility, among other factors. (Tr. 47). This constitutes substantial evidence—Pearson's assertion that the ALJ "failed to cite any evidence of record to support the finding that [her] condition had not changed since the 2011 ALJ Decision" proves utterly baseless. (Doc. 14 at 20).

Alternatively, Pearson submits that the ALJ could not logically have determined whether Pearson's condition had "change[d]" since the prior decision: "[T]here is only evidence upon which to make a finding relating to Plaintiff's condition *after* the 2008 ALJ Decision and no evidence relating to her condition at the time of the 2008 Decision." (Doc. 14 at 21). By this reasoning, Pearson claims the ALJ could not properly have determined whether or not her condition deteriorated.

Pearson again seeks to mislead the Court by listing 2008 as the year of the prior decision, rather than 2011. Even so, the ALJ's opinion lists medical records extending back to 2008. (Tr. 41, 53). Taken alongside the findings in the prior ALJ decision, the

35

record before the ALJ in this case, and discussed in the opinion, plainly contained enough material for the ALJ to determine whether deterioration occurred in the intervening period.

### 5. The ALJ Did Not Err in Omitting Discussion of Pearson's Worker's Compensation Settlement

Pearson notes that the Commissioner must "consider a claimant's favorable Worker's Compensation decision" under SSR 06-03p. (Doc. 14 at 25). Indeed, SSR 06-03p requires the Commissioner to evaluate "decisions by other governmental and nongovernmental agencies," and thus "evidence of a disability decision by another governmental . . . agency cannot be ignored and must be considered." 2006 WL 2329939, at *6-7 (S.S.A. Aug. 9, 2006).

Absent "special circumstances . . . the claimant bears the ultimate burden of proving disability." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). Only where a claimant is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures" does a "special, heightened duty to develop the record" adhere to the ALJ. *Id.* None of these special circumstances applied to Pearson's prior application. As such, the duty to submit Pearson's Worker's Compensation Settlement into evidence in the prior hearing rested solely with Pearson. *See* 20 C.F.R. § 404.1512(a) ("You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled.").

Evidence of Pearson's Settlement was available before the Commissioner's prior determination became final, and thus relates to an already adjudicated period. (Doc. 14 at

22). Her failure to submit such evidence equated to a waiver—(Tr. 132) (indicating that Worker's Compensation evidence was never received)—and this Court cannot now consider it afresh without reopening the prior ALJ's binding disability determination, which this Court may not do. And in any case, the ALJ considered the prior Worker's Compensation settlement, as the transcript from the hearing makes evident. (Tr. 59-60).

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Pearson's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local*

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 18, 2016                             S/ PATRICIA T. MORRIS
                                                    Patricia T. Morris
                                                    United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 18, 2016                             By s/Kristen Castaneda
                                                    Case Manager